**Superior Court of the District of Columbia**
**CIVIL DIVISION**
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Filed
D.C. Superior Court
08/20/2019 16:02PM
Clerk of the Court

Belinda Henson
_____
                          Plaintiff

vs.

                                                    Case Number  2019 CA 002707 B

Howard University Hospital Faculty Practice
_____
                          Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Martin F. McMahon
_____
Name of Plaintiff's Attorney

1717 K St. NW - Suite 900
_____
Address
Washington, DC 20006

202-862-4343
_____
Telephone
如需翻译，请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주십시오.      ኣማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

Clerk of the Court

By _____
                          Deputy Clerk

Date  08/20/2019

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                 Super. Ct. Civ. R. 4

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

|  |  |
|---|---|
| BELINDA HENSON,<br>12625 Laurel Bowie Road, #2931<br>Laurel, MD 20709<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>HOWARD UNIVERSITY, INC.<br>D/B/A HOWARD UNIVERSITY<br>2400 6th Street, NW<br>Washington, DC 20059<br><br>And<br><br>HOWARD UNIVERSITY FACULTY<br>PRACTICE PLAN<br>Towers Building<br>2041 Georgia Avenue, NW<br>Washington, DC 20001<br><br>And<br><br>HOWARD UNIVERSITY HOSPITAL<br>Towers Building<br>2041 Georgia Avenue, NW<br>Washington, DC 20001<br><br>And<br><br>MARIE NEWMAN<br>Towers Building<br>2041 Georgia Avenue, NW<br>Washington, DC 20001<br><br>And<br><br>ALFRED R. MICHAEL III,<br>1800 Orleans St.<br>Baltimore, MD 21287<br><br>　　　　Defendants. | Civil Action No. 2019 CA 002707 B<br><br>**COMPLAINT WITH JURY DEMAND FOR DAMAGES DUE TO DEFENDANTS':**<br>**INTRUSION UPON SECLUSION, TRESPASS TO CHATTELS, CIVIL CONSPIRACY TO INTRUDE UPON PLAINTIFF'S SECLUSION, CIVIL CONSPIRACY TO TRESPASS TO CHATTELS, VIOLATIONS OF THE FEDERAL WIRETAP ACT (18 U.S.C. 2511, et seq.), AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** |

## INTRODUCTION

**COMES NOW** the Plaintiff named herein, Belinda Henson, and hereby complains about the Defendants named herein, Howard University, Howard University Hospital, Howard University Faculty Practice Plan, Marie Newman, and Alfred R. Michael III (Alfred Michael), because they have illegally conspired to interfere with and terminate her employment relationship with Defendant Howard University (hereinafter HU) and more specifically Defendant Howard University Hospital (hereinafter HUH) and Howard University Faculty Practice Plan (hereinafter FPP) (collectively, these three Defendants are the "entity Defendants"). Defendant FPP's administrators, including Marie Newman, Dr. Walter Bland, Dr. Tanya Alim, Sherman Addison, and Marie Worrell, were instrumental in inflicting on the Plaintiff a hostile work environment by, *inter alia*, unlawfully directing Defendant Michael and others to hack into the Plaintiff's computers, cell phones, and online accounts. As a result of their illegal conduct, which violated at least two criminal statutes (D.C. Code § 23-542 and M.D. Code § 7-302), and the harassment they perpetrated on her as detailed herein, she was terminated in June of 2017.

This hostility toward her came about as a result of the Plaintiff consistently notifying them about issues and a myriad of problems going on within her department. These problems included: supervisors stealing from Plaintiff and her colleagues' paychecks and retirement accounts, altering her health insurance to make health care more expensive for her, and hacking into her personal devices—computers and personal cellphones—and altering or deleting the contents. On multiple occasions, Defendant Michael, acting at the direction of the administrators, and with the help of other members of his IT staff, used sophisticated computer and technology skills to secretly infiltrate Ms. Henson's devices remotely from his own work or personal computer in an effort to both intimidate her and to delete or change her emails reporting inefficiencies and corruption within her department.

Ms. Henson's allegations of inefficiencies and corruption occurred during the same period when HUH and its parent, HU, were experiencing continuing questions about irregularities at Howard institutions.[1] Press reports detailed cases of embezzlement by university administrators[2] and the corresponding response: a walkout by students in protest of the wasting of their hard earned—or hard borrowed—tuition funds.

In the wake of such reports, it is understandable for the Plaintiff's superiors to do all they could to bury her complaints of mismanagement at the University's well-respected medical facilities. This case brings Ms. Henson's reports—and management's efforts to suppress them—into sharp focus.

This lawsuit is brought under one federal statute (18 U.S.C. § 2510, et seq) and various D.C. and Maryland state law tort claims. Plaintiff herein seeks judgment in the amount of $750,000 for the copious amount of damages she has sustained as a result of Defendants' actions. These damages are due to emotional distress and financial damages she suffered as a result of the Defendants' malicious conduct for which she deserves to be compensated.

## PARTIES

1. The Plaintiff named herein, Belinda Henson, is an American citizen who was domiciled in Laurel, Maryland (at the time the alleged incidents occurred). She was employed in the District of Columbia with HUH as an Administrative Assistant II from April 25, 2011, until on or around February 24, 2015. On February 25, 2015, her organization adopted a new identity and became FPP, where she worked from February 25, 2015, as a Patient Service

---

[1] *See* Danielle Douglas-Gabriel, <u>Are finances at Howard University better or worse under the current president?</u>, WASHINGTON POST, available at https://www.washingtonpost.com/news/grade-point/wp/2017/04/14/are-finances-at-howard-university-better-or-worse-under-the-current-president/?utm_term=.628005bfe773 (last accessed February 7, 2019).

[2] *See* Debra Alfarone, <u>Digging for answers after Howard University embezzlement scandal</u>, WUSA-TV, available at: https://www.wusa9.com/article/news/local/dc/digging-for-answers-after-howard-university-embezzlement-scandal/65-533011161 (last accessed Feb. 7, 2019).

Representative until on or around June 15, 2017, when she was forced out of FPP after she had reported problems within her department by her colleagues and Defendant administrators. As a Patient Service Representative, she worked in FPP's Mental Health Section (hereinafter her "department").

2. Defendant HU, according to its website, was established in 1867 and "is a private, research university comprised of 13 schools and colleges." It is located in the District of Columbia at 2400 6th Street, NW.

3. Defendant HUH is a private corporation owned and operated by Howard University located in the District of Columbia that has been around for over 150 years and owns or leases office space at 2041 Georgia Avenue. According to its website, HUH "provid[es] the finest primary, secondary and tertiary health care services,... [and] has become one of the most comprehensive health care facilities in the Washington, D.C. metropolitan area... In April 2007, the Hospital ranked number one among selected area hospitals on 19 quality measures published by the U.S. Health and Human Services Department."

4. Defendant FPP is a unit owned and operated by Howard University Hospital and is located at 2041 Georgia Avenue, NW (Towers Building). According to their website, FPP is "home to the individual healthcare practices of the Doctors of Howard University. Our 200 plus doctors are professors of the Howard University College of Medicine and represent medical expertise in a vast array of specialties and subspecialties." It contains the specific department (the Mental Health Section) where the Plaintiff and each of the individual administrators worked during the relevant period.

5. Defendant Marie Newman was a Clinical Practice Supervisor for FPP during the relevant period and currently holds that position on information and belief. As such, she is an agent

for each of the entity Defendants. She was also the Plaintiff's direct supervisor during the relevant time period.

6.  Defendant Alfred Michael was the Information Technology (IT) Manager for FPP during the relevant period. As such, he was an agent for each of the entity Defendants. On information and belief, he has moved on from FPP and works at Johns Hopkins University in Baltimore, Maryland as a LAN Administrator performing a similar role.

## JURISDICTION

7.  This Court has jurisdiction over the claims presented in this Complaint as they all are civil causes of action and the total amount that the Plaintiff asks for to compensate her for based on her causes of action exceeds $10,000. Hence, each of her claims falls into the Court's general jurisdiction pursuant to D.C. Code § 11-921.

8.  The Court has personal jurisdiction over each of the Defendants in this case as they are either domiciled in this judicial district and fall within D.C. Code §13-422, or worked in this judicial district during the relevant period and fall within D.C.'s long-arm statute (D.C. Code §13-423(a)).

## VENUE

9.  Venue is appropriate in this Court because all of the Plaintiff's claims herein occurred in this judicial district and because the Plaintiff worked for Defendant FPP in this judicial district. In addition, most if not all of the witnesses for this case are located in this district.

## RELEVANT STATUTES

10. Federal Wiretap Act, 18 U.S.C. § 2511, et seq., also known as the Electronic Communications Privacy Act.

**18 U.S.C. § 2511. Interception and disclosure of wire, oral, or electronic communications prohibited:**

**(1)** Except as otherwise specifically provided in this chapter any person who

**(a)** intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;
**(b)** intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when:
　**(i)** such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or
　**(ii)** such device transmits communications by radio, or interferes with the transmission of such communication; or
　**(iii)** such person knows, or has reason to know, that such device or any component thereof has been sent through the mail or transported in interstate or foreign commerce; or
　**(iv)** such use or endeavor to use (A) takes place on the premises of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or (B) obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or
　**(v)** such person acts in the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States;
**(c)** intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;
**(d)** intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;…
　　Shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).
…
**18 U.S.C. § 2520. Recovery of civil damages authorized:**

**(a) IN GENERAL.—**
　　Except as provided in section 2511(2)(a)(ii), any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate.
**(b) RELIEF.—** In an action under this section, appropriate relief includes—
　　**(1)**
　　such preliminary and other equitable or declaratory relief as may be appropriate;
　　**(2)**
　　damages under subsection (c) and punitive damages in appropriate cases; and
　　**(3)**
　　a reasonable attorney's fee and other litigation costs reasonably incurred.
**(c) COMPUTATION OF DAMAGES.—**
…

**(2)** In any other action under this section, the court may assess as damages whichever is the greater of—
  **(A)**
  the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or
  **(B)**
  statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000.

## RELEVANT FACTS

11. The Plaintiff began working for HUH in 2011 as an Administrative Assistant II.  As soon as she joined the hospital, she hit the ground running, fixing some of the problems that had been plaguing her new department for some time. These problems included the ongoing Health Insurance Portability and Accountability Act (HIPAA) violations (i.e., patients' privacy violations) that were occurring in her department. She was quickly able to remedy these issues and put the department in a better position moving forward. Also, she was seen by her colleagues as being a great employee as evidenced by the performance reviews she received from her supervisors at HUH and Children's National.

12. Then, in 2015, the entity for which she worked was changed from HUH to FPP, and almost all of the people in her former department were let go, except for her and another person who remained a hospital employee onsite but was not brought on with FPP. With this new entity change came a host of new problems and Plaintiff's eventual termination.

13. In the months leading up to the Plaintiff's termination from FPP on June 15, 2017, she was subjected to months of harassment, invasions of her privacy, and toxic ill-will, perpetrated by her superiors, all with the intention of forcing her out of her position. This unlawful behavior by the administrators in her department was brought about for the sole reason that the Plaintiff had notified them multiple times about systemic problems occurring within her department (FPP) starting as early as 2015. *See* Series of Emails between Belinda Henson and

7

FPP Administrators from 2015 to 2017, attached hereto as Exhibit A [hereinafter Ex. A]. These problems which are laid out more in depth *infra* included employees taking absurdly long lunches and employees failing to cover their assignments at the front desk, both of which hurt the efficiency and productivity of her department.

14. The Plaintiff put her higher-ups on notice about these types of problems in a series of emails and meetings starting in 2015 and continuing up until the first few months of 2017. *See* Ex. A. For example, in a meeting around December 2016, Plaintiff met with administrators and expressed her concerns about the current state of affairs in the office. Specifically, she reported, as she had already done previously:

    a. Defendant Newman's perpetual misconduct towards her;

    b. FPP staff employees' abuse of time and attendance procedures;

    c. Resident physicians' noncompliance with department processes, procedures and policies; and

    d. Hospital staff and resident physicians were using the handwritten appointment book at the front desk to book patients' appointments instead of the electronic system that was already in place, which led to a high error rate (e.g., patients showing up for appointments that were scheduled on different days).

15. The Plaintiff had developed a proposal to fix the appointment system which she relayed to the Defendant administrators, but they ignored her, which left the appointment system in a state of chaos and prevented FPP and HUH as a whole from running properly.

16. At another meeting with administrator Marie Worrell on May 4, 2017, the Plaintiff informed her that Defendant Newman had been shorting her paycheck a total of $800 over her last three paychecks. She also informed Worrell about Newman's constant harassment toward her, in that Newman would needlessly and continuously micromanage, belittle, and single out

8

the Plaintiff for undeserved mistreatment, even though other employees were actually not performing their jobs properly. Ms. Worrell looked concerned by what the Plaintiff had just explained to her, but ultimately did not do anything to remedy the situation, or even attempt to justify Defendant Newman's actions—a common theme whenever the Plaintiff would report an issue in the two previous years. The Plaintiff also informed administrators Sherman Addison and Dr. Tanya Alim of the shortages in her paychecks around this time, but neither one of them did anything about it.

17. Moreover, she also told the administrators and the office of Human Resources Benefits & Retirement Services (HRBRS) at some point about discrepancies in her medical benefits, pension, and leave accruals, in that it appeared as if she was being overcharged for her benefits and the amount in her pension was lower than it was supposed to be. However, she was not able to have access to these accounts as she was purposely and repeatedly locked out of her PeopleSoft account and could not access or view her financial documents, including her payroll records, and notice of a salary increase, which they withheld from the Plaintiff for weeks.

18. The administrators, nor HRBRS or the pension operator, TIAA (Teachers Insurance and Annuity Association of America), fixed her pension after she reported the inconsistency with the amount that was supposed to be reflected. Additionally, she reported that she believed someone from FPP was stealing money from her retirement benefits, but nothing was ever done about these allegations. Plaintiff suspected this was the case because a former human resources employee confirmed that there were no employee paid deductions or employer paid contributions allocated to her pension plans after her transition from HUH to FPP. The Plaintiff also informed administrators and the office of HRBRS that her leave accruals were also short in terms of days and nothing was done to correct the inaccuracies.

19. After some two to three years of reporting problems such as the aforementioned to the FPP administrators (including Defendant Newman), the administrators had enough and began conspiring to interfere with Plaintiff's employment relationship and ultimately run her out of the department, *inter alia*. The Plaintiff realized that this was occurring because the administrators and staff were becoming increasingly hostile toward her, starting at about the last part of 2016, beginning of 2017.

20. For example, for the entire time she had been working for FPP, with the permission of her superiors, she had been using an electronic timekeeping system within Microsoft Outlook to keep track of her hours worked. However, sometime in early 2017, she was told that she had to physically clock in and out whenever she would go on a break or come in or leave work— just one example of *an overt act* in furtherance of their conspiracy to drive her out of the department.

21. This change required her to walk two blocks in order to manually clock in and out at a KRONOS time clock because there was not a time clock at her worksite, whereas, under the electronic timekeeping system, she could just clock in and out from her desk. The administrators told her to make this switch because it was required by the HUH/HU employee handbook, which she had never received or signed off on until two months or so before her termination when she was provided a copy—a denial of due process. As a result of her failure to comply with this policy, even though she had been given prior approval to use Outlook, she was terminated.

22. Another example of the hostile work environment she faced was the fact that other employees started to be extremely distant toward her, or even avoided her altogether, whereas for most of her time working for HU, her colleagues had been nothing but cordial toward

her. In addition, both administrative staff and resident physicians would avoid eye contact with the Plaintiff whenever she walked by them or tried to ask them a question.

23. The fact that this was occurring out of nowhere suggests that the administrators had planted the seeds in the employees' minds that she was a bad employee, and they hoped her colleagues' ill treatment of her would help convince the Plaintiff to resign on her own.

24. For example, in the presence of the Plaintiff, Defendant Newman improperly disclosed details from a confidential administrative meeting held regarding the Plaintiff's recommendation to have an employee reassigned to another department for poor performance. She disclosed this information because she was trying to stir up conflict in an already existing hostile work environment for the Plaintiff.

25. The administrators were making it clear to the Plaintiff that they did not appreciate, nor did they endorse her written reports of problems in the department. As the problems seemed to increase, Plaintiff increased her written reports of improper, inefficient and costly activities within FPP. The administrators of the department then became concerned that they would look ineffective or weak in the eyes of *their* superiors. In an effort to stem the tide of inefficiency reports working their way up the chain of command, the administrators chose to go on the offensive with the Plaintiff. Their solution was to harass the Plaintiff to the point of pushing her out of her job, hoping she would resign and leave with all of her knowledge about the mismanagement going on in their workplace.

26. At this stage just a couple months before she was terminated, the entity Defendants' administrators specifically directed Alfred Michael, Defendant FPP's IT Manager, his staff, and other agents, to hack into the Plaintiff's work computer, home computer, and personal cell phone to remove and change sensitive information and documents likely starting sometime in the last few months of Plaintiff's employment in 2017. Information and

documents that were removed or altered included certain emails related to the Plaintiff's reporting to superiors of the previously mentioned issues she was having with administrators, as well as problems going on within FPP as alleged *infra*. *See* Screenshot of Recovered Fragments from Digital Forensics Investigation Evidencing Deletion of Sender and Recipient Information, attached hereto as Exhibit B [hereinafter Ex. B]. This hacking was *another overt act* committed in furtherance of the conspiracy to drive the Plaintiff out of FPP.

27. Moreover, not long before she was terminated, the Plaintiff discovered that Michael and the administrators were listening in on her private phone calls on her work and personal phones because Defendant Newman had mentioned an interaction with Plaintiff's work phone's voicemail box that appeared to be regarding monitoring by someone in their department. When the Plaintiff asked her if she was being monitored, Defendant Newman did not respond coherently. She also heard unexplained echoes while she was speaking with people on her work and cell phone multiple times, and saw the word "Forwarding" on her cell phone's screen at a certain point (appearing to indicate that the call or a message was being sent on somewhere such as to one of Defendant Michael's devices), which was not something that had ever popped up in her prior years working for FPP.

28. Shortly thereafter, many events occurred that increased the Plaintiff's suspicions about phone monitoring, including Plaintiff's work phone oddly not having a dial tone for a short period. When the dial tone returned, the Plaintiff's phone's date, time, and features were disabled (i.e., she was unable to retrieve voicemail messages, place callers on hold, transfer callers, use multiple phone lines, use conference calling, etc.) and all of the reception desk calls were being routed to the Plaintiff's work phone instead of the front desk.

29. In addition, her personal phones and accounts seemed to be compromised as well, as the word "[DRAFT]" began to appear in the Plaintiff's personal cell phone text messages. This

was also appearing in her work Outlook email account (HU) when administrators and Defendants Michael confiscated her work email accounts (HUH and HU), revising and deleting her email accounts' content.

30. The Plaintiff was first alerted to someone else accessing her devices on or around late May, early June 2017 as a result of applications being opened on each of these devices, and features that were being activated, that she had never used before, or at least had not used in years. Moreover, an unusual notice came up on her personal cell phone that said she had an Android hardware update, which is not typically uncommon. However, this request for an update was extremely different from past update notification requests she usually received because a large image of the Android's avatar appeared covering the entire screen which had never happened before or since. The Plaintiff's devices also began malfunctioning, making the devices inoperative.

31. For example, when the devices were in the "off" position, applications would automatically turn on. In addition, for whatever reason, Defendant Michael integrated the Plaintiff's Microsoft Outlook work email onto her personal devices at this time, which placed confidential patients' information onto her personal devices.

32. So, Alfred Michael, at the specific direction of the FPP administrators, and other colleagues in the IT department he oversaw, as well as contractors and agents of HU and HUH, began deleting email evidence of Plaintiff's reporting of her concerns regarding issues in the department and problems she had with things happening specifically to her after her department's transition from HUH to HU. As it pertained to her specifically, problems included things already mentioned herein (e.g., Defendant Newman shorting her pay), but also the termination and overcharges in her health benefits and issues with the Plaintiff's 403b retirement savings plan. Regarding her 403b savings plan, the Plaintiff was being charged

more in health plan benefits costs than other employees, according to the printed enrollment year's published literature. She later discovered that the entity Defendants, who previously paid 403b contribution(s) of 2%, were now only paying 1%, resulting in the Plaintiff losing thousands of dollars which they later reimbursed after wrongfully terminating her, conveniently calling it an "operational error".

33. In regard to issues in the department, the Plaintiff sent various emails, initiated administrative meetings, and brought awareness to general problems in the department, but her concerns were usually ignored. Other specific problems in the department that the Plaintiff tried to highlight and the FPP administrators wanted to cover up included:

    1) Hospital staff and residents ignoring of medical records procedures;

    2) Security concerns such as:

        a. Employees' expressed safety concerns about working in a mental health center with no security measures in place;

        b. Panic buttons and security cameras not working;

        c. Unstable and violent patients with mental health illnesses;

        d. Unsecured entry doors;

        e. Campus police reports resulting in no follow up and/or final report;

    3) The front desk often being left unattended;

    4) Staff and residents taking longer than reasonable lunch hours;

    5) Staff not using the patients' electronic appointment scheduling system;

    6) Staff not collecting patients' co-payments;

    7) Staff not checking and clearing the main office phone line's voicemail box;

    8) Staff not delivering messages regarding authorizations, refills, messages left for the providers;

9) Staff needlessly cancelling patients' appointments and not contacting patients regarding their appointments being cancelled or rescheduled;

10) Residents refusing to take patients arriving a few minutes late for their appointment when they could have worked with them to get them into the schedule;

11) Patients receiving continuous refills without proper follow up by residents or doctors, jeopardizing patients' health and safety and resulting in a loss of revenue for the entity Defendants;

12) Patients' enduring unnecessarily long wait times in the waiting area;

13) Staff's CPR certifications never being received although they were requested numerous times;

14) Health department issues, e.g., HIPAA issues and OSHA non-compliance (mold from flood water damage throughout the entire building, the unsafe conditions of the exterior doors);

15) The department's network being continuously down for long periods of time which affected productivity because the main office phone line, staff's office phones, the internet, staff's office computers, and the network all-in-one printer, all could not work;

16) Theft in the workplace (e.g., a stolen flat screen TV and a stolen smart watch purchased for a research project); and

17) A specific incident where a patient fell out of a wheelchair.

34. Around the same time that the Plaintiff began to notice things were being deleted and changed on her work computer and personal devices in or around the middle of May 2017 (a month or so before she was terminated), a contractor hired by HUH came into the

Plaintiff's office at FPP and informed her that he needed to make copies of her work hard drive in order to perform an upgrade. Hence, he was going to switch out her hard drive and install a new hard drive.

35. When the Plaintiff asked him if he was upgrading and making copies of anyone else's hard drive as he was saving her files, he responded that it was just hers.  He copied her files from the old hard drive to the new hard drive then shortly afterwards he received a phone call. After getting off the phone, he told the Plaintiff that FPP administrators told him to discontinue the upgrade because they said they had something else in mind for her upgrade. He was instructed to uninstall the new hard drive and reinstall the old hard drive which he did.

36. Sensing something weird was going on, the Plaintiff expressed concerns to the contractor regarding a copy of her files being saved on the new hard drives and asked him about if he was going to remove her files.  He assured her not to worry and that they scrubbed all used drives before using them again stating her files will be permanently deleted. But it appeared that he did not actually delete the files, though, and instead ended up keeping a copy of the files likely for the benefit of the FPP administrators who wanted to see its contents in order to become familiar with the wide scope of her complaints.

37. The Plaintiff became so concerned about her personal devices' privacy at this time that she went to visit the Geek Squad at Best Buy, to have them take a look at her home computer. The person she was dealing with there told her to set up a separate administrative account, which would allow her to find out if someone from her office was illegally accessing her devices. Not long after following the employee's advice, Plaintiff viewed someone she believed to be Defendant Michael accessing her personal at-home computer—in real time— without her consent, deleting information. This viewing of someone in her devices occurred

in around late May 2017, but it continued to occur after she was terminated starting in mid-August 2017 and throughout 2018.

38. Plaintiff knew it was Defendant Michael, or someone in FPP's IT department, because she saw the exact same type of programming behavior (e.g., her computer mouse cursor was moving erratically on the screen) on her work computer before she was terminated. Around this time, then, in June 2017, she filed a report with the FBI detailing the electronic hacking into her phone and computers, but no investigation was ever done to her knowledge.

39. On or around June 15, 2017, the Plaintiff was terminated from FPP for being insubordinate by not utilizing the time sheets that FPP requested she use during the time she reported various issues to her superiors. Although she eventually began using the time sheets and KRONOS clock in and out system (weeks before her termination), she was terminated for not using it. This was the case even though she had been authorized for over two years to clock in and out using Microsoft Outlook. Now, though, she was being fired for not fulfilling a minor aspect of her job, which was a pretext for terminating her to silence her and her criticism, even though she did switch over to their new system before she was terminated.

40. The repeated intrusions into her seclusion have been occurring as recently as August of 2018. On information and belief, the Defendants have continued to interfere with the Plaintiff's devices, as she discovered more evidence of deletions and insertions by an unauthorized party (most likely Defendant Michael or at least someone associated with the entity Defendants) in her personal email accounts (AOL and her private company's email). The Plaintiff was so concerned about the continued interference that she contacted the FBI again at this time as well as her local police station in Prince George's County, Maryland. However, nothing has come out of these attempts at having her concerns investigated.

41. All of the gross invasions of her privacy, in combination with her deteriorating work environment, caused the Plaintiff to suffer severe emotional distress toward the end of her employment relationship, to the point where she would constantly pick at her skin, including on her face. In response to her cuts and scars, she would put on a great deal of makeup to try to cover them up from her coworkers. This did not work, however, because her colleagues began to notice. For example, during a meeting toward the end of May 2017, on a day where the Plaintiff's scars were quite visible especially on her face, one of the administrators (Sherman Addison) asked her if she was diabetic.[3] She responded that she was not, but now she became concerned that her colleagues began to notice her physical signs of distress.

42. The severe distress and paranoia that the Plaintiff has suffered as a result of the entity Defendants' employees' actions were further evidenced by the fact that she quit her part-time job at another hospital, Children's National Medical Center, a few months after she was terminated by FPP around August 2017. She left this position because of her fear of the entity Defendants' employees' actions, i.e., the continued hacking into her personal devices and monitoring of her phone conversations, even though she had worked this part-time job for some twelve (12) years and had a very positive working relationship with that entity. Hence, she was worried that the invasions of her privacy would crop up while she was working at this other hospital, so, in addition to her fearing for her own safety, she did not want staff and patients at this other hospital to be affected by this behavior.

43. While the Plaintiff eventually sought help for the distress she was facing, the emotional distress and the toll that the Defendants' actions have taken on her continue to this day.

---

[3] One of the symptoms of diabetes includes skin ailments. For more information, *see* Diabetes: 12 warning signs that appear on your skin, AMERICAN ACADEMY OF DERMATOLOGY, https://www.aad.org/public/diseases/other-conditions/diabetes-warning-signs (last accessed Nov. 2018).

Moreover, as a result of her pretextual termination, the Plaintiff has been forced out of her home as a result of her inability to pay her rent, has lost her online business, has had to live in a motel for a period of time, has had her car repossessed (and at the time of this Complaint the car is going to be subject to a forced sale), and, recently, has been homeless and had to apply for human services and housing assistance from the government.

44. Notwithstanding those transgressions, the termination which is the subject of this lawsuit has resulted in extraordinary difficulties for the Plaintiff in securing interviews and employment. She has applied for dozens of jobs, and when she actually had the chance to interview or at least speak with a potential employer, they always ask her about the circumstances that resulted in her termination from FPP. She then tries to explain the horrendous circumstances which forced her out, and is met with a skeptical response and a decision to not hire her. Hence, the nefarious circumstances under which the Plaintiff was terminated have made it almost impossible for her find suitable employment for over almost two years.

## FIRST CAUSE OF ACTION: INTRUSION UPON SECLUSION UNDER D.C. AND MARYLAND LAW

45. Plaintiff hereby repeats and re-alleges paragraphs 1 - 44 as if fully recited herein.

46. To bring a cause of action based on the invasion of privacy tort of Intrusion upon Seclusion (IS) under DC and Maryland law, the elements are essentially the same, i.e., the Plaintiff must demonstrate three elements:

   1) An invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or *by use of some form of investigation or examination*;

   2) Into a place where the Plaintiff has secluded himself, or into his private or secret concerns;

   3) That would be highly offensive to an ordinary, reasonable person.

19

47. To satisfy the first element, Defendant Alfred Michael (and other colleagues of his and agents working on behalf of HU or FPP), in conjunction with the administrators of FPP such as the Plaintiff's supervisor Defendant Newman, hacked into the Plaintiff's work and personal computers, as well as her personal cell phones, and, for whatever reason, integrated HUH's email system onto the Plaintiff's personal devices without her consent. On various occasions, Defendant Michael and his cohorts used their computer skills to remotely intrude onto the Plaintiff's computer to alter its contents and hack into her cell phones to track her movements and phone calls. Some evidence of these hacks was discovered through a forensic audit performed at Ms. Henson's request at considerable expense, but also after her own investigation, as already alleged herein.

48. Through these methods, the Plaintiff discovered a number of mysterious unauthorized actions, including:

    a.  Some devices or programs that she did not own, authorize, or install had been in use on her computer;

    b.  The addition of an anonymous account name that had been used to peruse her computer;

    c.  Computer drafts of documents she had not written; and

    d.  In late May 2017, she observed—in real time—that her computer and mouse cursor were moving extraordinarily fast, which she had already seen happen on her work computer some days prior. Upon examining her device, she was able to see that the person who was causing this to happen was using a VPN (virtual private network) to remotely access her devices, without her permission.

49. On information and belief, Defendant Michael, other members of his IT department, and agents and contractors of the entity Defendants, were responsible for this intrusive behavior that the Plaintiff's devices were experiencing and continue to experience.

50. Moreover, even after she was terminated and as late as August 2018, Defendant Michael, or at least someone on behalf of the entity Defendants, was continuing to intrude into the Plaintiff's devices. On or around August 7, 2018, the Plaintiff noticed her Microsoft Office account had also been hacked by HU/FPP and/or HUH. She discovered this because the hacker(s) assigned him or herself a "parent" account using the Plaintiff's former hospital email address (bhenson@huhosp.org) and changed the Plaintiff's account to a "child" account giving the person full control of her account's activities and restricting her access to her email. *See* Screenshots of Belinda Henson's Microsoft Outlook Account, attached hereto as Exhibit C [hereinafter Ex. C]. The Plaintiff never did this and had no reason to do so either.

51. The hacker had the ability to, *inter alia*, monitor the Plaintiff's browsing history, applications used, and Microsoft documents created and saved. As a result of what she found and what the hacker or hackers did, the Plaintiff submitted a ticket (i.e., request for help or assistance) through Microsoft's website to report the crime. And in December 2018, the Plaintiff discovered that her Lyft account (a ridesharing application on your phone that allows a person to get a ride to a particular destination) was hacked. She knew this because there was a foreign PayPal email address attached to her application's payment area. The Plaintiff notified Lyft immediately on or around December 11 and has followed up several times since then but has not received a reply.

52. Hence, the Plaintiff continues to see signs of intrusion in her private concerns to date. Another example of this was that her Bank of America small business debit card was closed

in April 2018 due to suspicious activities. She learned of this when trying to use her card a few times and it would not work. Hence, she went to the Bank of America branch in Beltsville, MD and a bank manager said her card was closed for suspicious activity. She asked him a series of questions regarding her card but he said he did not know why the card was closed by the bank. Upon calling Bank of America's fraud department, the Plaintiff spoke with a representative who researched her account and the representative said the notes were no longer available. She also stated that their records reflected that the Plaintiff had closed the account which never happened.

53. To satisfy the second element of her IS claim, Plaintiff's personal computer and cell phones qualify as part of her private and secret concerns. She, or a family member, personally and exclusively used the devices that were being intruded upon without anyone else being authorized to access them. She pays the bills for them and uses them within the privacy of her own home. She never gave access to Defendant Michael, for example, to use her devices for his or the entity Defendants' own purposes.

54. To satisfy the third element of her IS claim, the hacking into the Plaintiff's personal devices should be highly offensive to an ordinary, reasonable person. The Plaintiff, like any other person who has a computer or cell phone, has private information on their device. This could be anything from folders on her desktop including sensitive financial documents, documents related to her bank account, healthcare, or even private videos and pictures.[5] But more importantly, a reasonable person would feel like their privacy was violated if they did not feel like they were able to use their computer or their cell phone without another person: a)

---

[5] *See Riley v. California*, 134 S.Ct. 2473, 2489 (2014) (Court describing the multi-use of cell phones: "The term 'cell phone' is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers.")

gaining unauthorized access to them, b) changing or deleting things on them; and c) accessing highly intimate, private information and copying it.

55. In addition, the Plaintiff was damaged as a result of the intrusions into her devices. These damages include the emotional distress that the Plaintiff faced upon discovering what her employer and colleagues were up to. But she also suffered economic damages as a result of the interference, as she paid over $4,000 to a company called Digital Forensics to investigate what was going on with her devices and then ultimately had to pay to get a new computer and cell phone as they became unusable as a result of Defendant Michael's and the other individuals' interference. As a result of the damage to her personal computer, she also lost 10 years or so of information on her personal computer.

WHEREFORE, Defendant Michael and his colleagues, as agents of the administrators and entity Defendants, intentionally interfered by physical means into the Plaintiff's personal devices contained on her person or in her home, in a way that was highly offensive to an ordinary, reasonable person, along with other agents of HU, HUH, and FPP. Moreover, the Defendant entities in this matter, under the doctrine of *respondeat superior*, are liable for the intrusion into seclusion committed by their agents, as they were acting within the scope of their employment when they intruded into the Plaintiff's seclusion. Hence, Plaintiff hereby requests this Court to enter judgment in the sum of $250,000 against all Defendants jointly and severally.

## SECOND CAUSE OF ACTION: CIVIL CONSPIRACY TO INTRUDE INTO PLAINTIFF'S SECLUSION UNDER D.C. AND MARYLAND LAW

56. Plaintiff hereby repeats and re-alleges paragraphs 1- 55 as if fully recited herein.

57. The elements for an intrusion into seclusion claim are already laid out at ¶ 46, *supra*. However, the elements for a civil conspiracy in D.C. are as follows:

1) There was an agreement between two or more persons;

2) To participate in an unlawful act or a lawful act in an unlawful manner;

3) That an injury was caused by the unlawful overt act or lawful act in an unlawful manner performed by one of the conspirators to the agreement; and

4) That the overt acts were done pursuant to and in furtherance of the common scheme.

The elements for civil conspiracy in Maryland are substantially similar.[6]

58. As previously alleged herein, the FPP administrators entered into an agreement to drive the Plaintiff out of FPP in order to keep her from further voicing her concerns about problems in their department. And, also has previously alleged herein, one of the ways they tried to silence her and force her out was by specifically directing the IT Department, and specifically the head of that Department, Alfred Michael, and other agents and contractors who work on IT matters for the entity Defendants, to delete information contained in the Plaintiff's work emails that pertained to her complaints with FPP while she was still employed there.

59. This deleting of information constituted the committing of an unlawful overt act in D.C. (e.g., D.C. Code § 23-542) and Maryland (e.g., M.D. Code § 7-302)—D.C. because the intrusions were committed from computers and devices in this jurisdiction, and Maryland because the intrusions occurred into Plaintiff's home computer and cellphones while they were located at her Maryland home.

---

[6] *See Marshall v. James B. Nutter & Co.*, 758 F.3d 537, 541 (4th Cir. 2014) ("Under Maryland law, civil conspiracy is defined as the combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff. In addition to proving an agreement, the plaintiff must also prove the commission of an overt act, in furtherance of the agreement, that caused the plaintiff to suffer actual injury. *Id.*") (internal citations and quotation marks omitted).

60. Defendant Michael and/or other entity Defendants' agents also hacked into her personal computer, as well as her personal cell phones and online accounts. This was likely done with the intent to learn what the Plaintiff was storing or communicating about regarding the chaos and inefficiency within FPP.

61. As alleged herein, the Plaintiff knew about this hacking because of the various foreign programs and software uploaded onto her devices that she had not installed and by seeing deletions in emails where there had previously been information. In addition, she saw evidence that FPP's administrators and Defendant Michael had been in her devices because she saw Defendant Michael access her work computer one evening when she stayed late and was still employed with FPP. During this session, her computer speed and mouse began moving extremely fast, and the next day she saw new software installed on her work computer. This behavior then started to occur on her personal devices as well.

62. She learned Defendant Michael and agents of FPP, HUH, and HU were monitoring her C:/ drive. She also saw the name "Anonymous" in the group list for permissions and she began seeing "Drafts" in her Outlook email account's folders entitled "Inbox", "Sent File", "Archives", "Drafts" and "Deleted Files". Then, she began seeing these exact behaviors and words in her personal computer and cell phone devices.  She also saw the word "Test" in the subject line of various emails that were added retroactively, and that she had not previously drafted or received.

63. As a result of Defendant Michael and the IT Department's intrusions into the Plaintiff's privacy, the Plaintiff was injured severely. She became deeply disturbed and distressed, as evidenced by the constant picking of her skin which was visible to her co-workers, and remains visible as a result of the intrusions which continued into 2018.

64. In addition, she lost her job partly as a result of the intrusions. By deleting information of the Plaintiff's notifying FPP/HUH personnel of turmoil in the office, Defendant Michael and his cohorts eliminated evidence that Plaintiff had discovered and reported on problems in the department. Removing that evidence eliminated one of Plaintiff's possible challenges to her eventual termination (i.e., as a whistleblower).

65. Before evidence of their workplace mismanagement was deleted, the Plaintiff had a body of evidence concerning problems in her department that she informed upper management about as already alleged herein. By deleting that information, then, the Defendants could fire the Plaintiff with no concerns that negative information about their office and organization would be exposed. Fortunately, she discovered Defendants' actions and decided to screenshot and save information of the deletions and doctoring of information while she was still employed there.

66. These actions of deleting and changing information about the Plaintiffs complaints were part of the conspiracy to intrude into the Plaintiff's seclusion as well as the overall conspiracy to drive the Plaintiff out of FPP, as detailed herein. Hence, the Defendants deliberately interfered with the Plaintiff's privacy to keep her quiet and then proceeded to fire her on questionable grounds.

WHEREFORE, the administrators for FPP and Defendant Michael have conspired to intrude into the Plaintiff's seclusion by directing Defendant Michael, and/or his staff, to hack into her work and personal devices. Moreover, the entity Defendants in this matter, under the doctrine of *respondeat superior*, are liable for the conspiracy to intrude into Plaintiff's seclusion committed by their agents, as they were acting within the scope of their employment when they intruded into the Plaintiff's seclusion. Hence, the Plaintiff hereby requests this Court to enter judgment in the sum of $250,000 against all Defendants jointly and severally.

## THIRD CAUSE OF ACTION: TRESPASS TO CHATTELS UNDER
## D.C. AND MARYLAND LAW

67. Plaintiff hereby repeats and re-alleges paragraphs 1 - 66 as if fully recited herein.

68. To bring a trespass to chattels claim in D.C., the Plaintiff must demonstrate that the

Defendant(s) intentionally:

      1)  Dispossessed her of the chattel(s); or

      2)  *Used or intermeddled with her chattel(s).*

69. To bring a trespass to chattels claim in Maryland, the Plaintiff must demonstrate that the

Defendant(s):

      1)  Intentionally used or intermeddled with the chattel in possession of another;

         and

      2)  As a result of that use or intermeddling, the chattel is impaired as to its

         condition, quality, or value.

70. Black's Law Dictionary defines a "chattel" as real or personal property. In this action, the

chattels at issue are the Plaintiff's computers (work and personal) and private cell phones.

That Dictionary also defines the concept of "intermeddling" as interfering with property, *inter*

*alia.*

71. When Defendant Michael, the FPP IT Department, and other agents of HU and HUH were

tasked with remotely accessing the Plaintiff's personal devices to add, change, copy and

eliminate certain information, he cyber-trespassed into the Plaintiff's chattels.[7] More

specifically, they intentionally intermeddled with the Plaintiff's devices at the direction of FPP

---

[7] *See* 7 American Law of Torts § 23:30 ("Many cases now apply the tort of trespass to chattels to electronic communication and intellectual property… [A]n interference with information stored on a computer may give rise to a cause of action for trespass to chattels if the plaintiff is dispossessed of the information or the information is impaired as to its condition, quality, or value. Therefore, **deleting emails destroys computer information and may constitute dispossession of the information if the deletion is without the consent of the possessor of the computer**") (emphasis added).

administrators when he hacked into the devices, installed various software, malware, and

spyware, and deleted information. This information included, as already alleged herein, emails

the Plaintiff had sent out regarding the misconduct at FPP, as well as miscellaneous

conversations the Plaintiff had with administrators who frequently contacted her on her

personal devices and through her personal email accounts for business purposes.

72. The entity Defendants' administrators sought to remove as much information on the

Plaintiff's devices as possible in order to make the Plaintiff's claims about the mismanagement

and arguably illegal practices of FPP seem disingenuous.

73. As a result of Defendant Michael's and the entity Defendants' contractors and agents' illegal

conduct, the Plaintiff's personal devices have been destroyed because their condition and

quality were substantially diminished, i.e., they stopped working properly to the point where

she had to purchase a new computer and new cellphones.

WHEREFORE, the Plaintiff requests that the Court enter judgment in the sum of $250,000,

against Defendant Michael and, under the theory of *respondeat superior*, against the other

Defendants jointly and severally, based on the illegal hacking by Defendant Michael and other

agents of the entity Defendants committed in the scope of their employment, for the damages

she has sustained as a result of their trespass to chattels.

## FOURTH CAUSE OF ACTION: DEFENDANTS CONSPIRED TO TRESPASS INTO PLAINTIFF'S CHATTELS UNDER D.C. AND MARYLAND LAW

74. Plaintiff hereby repeats and re-alleges paragraphs 1- 73 as if fully recited herein.

75. The elements for a trespass to chattels claim are already laid out at ¶¶ 67-68, *supra*, as are civil

conspiracy at ¶ 57 and footnote 6.

76. The aforementioned general conspiracy between the entity Defendants' administrators and

Defendant Michael was entered into with the intent to drive the Plaintiff out of FPP. With

respect to her trespass to chattels claim, the administrators, Defendant Michael, the FPP IT Department, and various contractors and agents of HU, HUH, and FPP, agreed that Defendant Michael and the contractors and agents would hack into her devices (work and personal) in order to delete, change and copy information contained therein, much of which would have looked poorly on the administrators and the department. These changes, deletions and copies were unlawful acts, as it is not legal for anyone, even someone's employer, to gain access to a person's private electronic devices without that person's consent.

77.  As a result of these unlawful acts, the Plaintiff and her devices were damaged. Plaintiff was personally damaged because she became severely distressed as a result of things disappearing from her computers and phones and other things being changed to the point where they reflected a non-stop pursuit in violation of her right to privacy leaving her terrified for her and her family's safety. She is in a constant state of paranoia and fear, and feels humiliated for having her personal life, content and calls accessed by her former administrators and IT staff. She is also devastated with the entity Defendants' employees listening to her calls as she sought mental health services for her and a family member (i.e., a HIPAA violation). These disturbances have continued to this day, as she is still reeling over the multiple invasions of her privacy that occurred during her tenure at FPP and have been occurring since even as late as August 2018.

78. Plaintiff's devices were destroyed as they began to stop working properly because Defendant Michael and others installed various software, malware and spyware on her computer that gave them and FPP administrators access to their contents. She had to buy a new personal computer, cell phone and printer as a result of their actions on behalf of FPP administrators.

WHEREFORE, the Plaintiff requests that the Court enter judgment in the sum of $250,000, against Defendant Michael and, under the theory of conspiracy liability, against the other Defendants jointly and severally, based on the illegal hacking by Defendant Michael and other agents of the entity Defendants who were acting in the scope of their employment, for the damages she has sustained as a result of their trespass to chattels.

### FIFTH CAUSE OF ACTION: DEFENDANTS' VIOLATED THE FEDERAL WIRETAP ACT (18 U.S.C. § 2510, ET SEQ.)

79. Plaintiff hereby repeats and re-alleges paragraphs 1 - 78 as if fully recited herein.

80. All of the Defendants herein have violated 18 U.S.C. § 2511(1)(a), (b), (c), and (d) (*see* Relevant Statutes, *supra*), and therefore the Plaintiff can bring an action under 18 U.S.C. § 2520. This is because Defendant Michael and other agents for the entity Defendants have personally intercepted written, electronic communications which were sent in interstate commerce from the Plaintiff's personal devices, and the FPP administrators such as Defendant Newman procured them to intercept these communications.

81. These communications, which Defendant Michael, *inter alia*, deleted and altered various information from such as the body of an email, included email correspondence from the Plaintiff's work email and personal email, at least some of which pertained to the Plaintiff's reporting of various issues going on with work at FPP. It also included other emails that pertained to private conversations with various people in her personal email, as well as her online accounts with Lyft, for example. No one, such as her work colleagues, should have had access to her personal emails, correspondence, and online accounts, besides the Plaintiff and any authorized other users (e.g., family or friends).

82. Moreover, Defendant Michael, various FPP and HUH contractors and agents, and FPP administrators such as Defendant Newman intercepted or procured others to intercept oral,

phone communications from the Plaintiff and accessed her contacts' personal data. On information and belief, these individuals gained access to conversations the Plaintiff had on her work and personal cell phone. The Plaintiff became aware of this in mid to late May 2017 when her work phone calls kept dropping just before she provided details to the helpdesk regarding the department's network being continuously down and for long periods.  She also reported hearing a very loud echo in the phone's receiver. She learned that her personal cell phones were being listened in on as well, because she saw the word "Forwarding" fade out on her personal cell phone screen after ending a call, which is not something that had happened before.

83. Defendant Michael, in conjunction with employees in his IT department and agents of the entity Defendants, and at the specific direction of FPP administrators (including Defendant Newman), illegally intercepted these correspondences that were sent in interstate commerce by remotely accessing her devices via their own work or personal computers. Then, on information and belief, they would share the information they found on the Plaintiff's devices and discuss their illegal actions with the other entity Defendants' administrators to update them on their progress of limiting the ability of the Plaintiff to later—via this lawsuit for example—detail all of the problems going on in FPP. In addition, the administrators gained access to the Plaintiff's oral communications by listening in her phone calls, which allowed them to discover the fact that she was seeking legal representation for the illegal hacking of her devices which they would have been unable to discover on their own.

84. These illegal acts were discovered by the Plaintiff in around late May 2017, when she saw various programs that she never installed on her computer and a number of her emails deleted and changed.

WHEREFORE, the Plaintiff requests that the Court enter judgment in the sum of $250,000, against Defendant Michael and, under the theory of *respondeat superior*, against Defendant Newman and the entity Defendants jointly and severally, based on the illegal hacking by Defendant Michael and other agents of the entity Defendants who were acting in the scope of their employment, for the damages she has sustained as a result of the interception of her private emails, online accounts, and phone calls.

## SIXTH CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

85. The Plaintiff hereby repeats and re-alleges paragraphs 1 - 84 as if fully recited herein.

86. To bring a claim for intentional infliction of emotional distress (IIED) in D.C., a plaintiff must allege: "(1) '[E]xtreme and outrageous' conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff 'severe emotional distress.' " *Sere v. Group Hospitalization, Inc.*, 443 A.2d at 37 (D.D.C. 1982) (citations omitted). Intent or recklessness can be inferred from the outrageousness of the acts.[8] The Restatement (Second) of Torts explains that conduct which otherwise may seem "reasonable" becomes tortious "when directed at an individual known to be particularly susceptible to infliction of emotional distress." Restatement § 46, Comment F, Illustrations 9-11 (1965); *Boyle*, 392 N.E. at 1056.

87. The Plaintiff was subjected to an enormous amount of emotional distress at the hands of the entity Defendants' agents and employees—her supervisors (e.g. Defendant Newman) and co-workers. Not only did she lose her job as a result of their misconduct, but the run-up to her wrongful discharge contained multiple months of intentional attacks on her integrity, her work ethic, her job performance and invasions of her personal privacy.

---

[8] *Id.*; *Anderson v. Prease*, 445 A.2d 612, 613 (D.C. 1982).

88. Over the course of around four years, the entity Defendants' agents and employees perpetrated the following acts against the Plaintiff in retaliation for her trying to put them on notice of problems in her department:

   1. Shorted her pay;

   2. Overcharged her for medical benefits;

   3. Improperly funded her pension;

   4. Locked her out of her retirement account;

   5. Hacked into her personal computer;

   6. Hacked into her personal cellphones;

   7. Deleted information from her devices;

   8. Installed programs on her computers; and

   9. Denied her a hardship loan (with the help of Defendant HU's benefits administrator), originally, at a time when she desperately needed it, even though she was qualified to receive it.

89. The constant, deliberate, and harassing drum-beat of attacks listed above began while the Plaintiff was still employed, and they had a devastating impact on her. As she attempted to complain about problems within her department, and rectify the attacks being foisted upon on her, she was stymied at every turn.

90. Like most Americans, the Plaintiff lived paycheck to paycheck. And she relied upon her paycheck—the full amount—for her life expenses and those of raising and supporting her two children. So, when she discovered Defendant Newman shortchanged her paycheck on three separate occasions in the sum of $800 (i.e., outrageous conduct), she notified FPP's Payroll Office and the entity Defendants' administrators. Her concerns were never rectified, however.

91. The unexplained and illegal cuts in pay and benefits made it difficult to make ends meet. When she tried to dip into her retirement account, administered on behalf of HU and FPP by TIAA (Teachers Insurance and Annuity Association), she discovered that her retirement payments were also being shortchanged. When she tried to rectify that through the TIAA access system, she was locked out of her account. When she tried to secure a hardship loan from TIAA—against her own deposits—in late February or early March 2017, she was rebuffed (twice). At the same time, HUH and its agents changed her medical coverage without justification.

92. These things came at a time, as discussed herein, when the administrators were getting fed up with all of the Plaintiff's complaints about mismanagement in her department. As alleged herein, they were intending to make her life difficult to convince her to terminate her employment, so they and/or other agents of the entity Defendants intervened to disrupt her benefits.

93. Issues with her paycheck and benefits were just the start, though, as also already detailed herein. The conspiracy between the entity Defendants' administrators (e.g., Defendant Newman), Defendant Michael, and agents and contractors of the entity Defendant organizations (HU, FPP, HUH), to intentionally drive her out of the department also included deleting and changing information from her work and personal computers, as well as her personal cell phones, which greatly exacerbated the Plaintiff's emotional distress. This was due in part to the fact that much of the information that was being changed or deleted had to do with the Plaintiff's reports of inefficiencies and corruption within FPP and HUH. Hence, she became extremely distressed about the fact that not only were her concerns regarding the department not being taken seriously, but that agents and employees of the entity Defendants were now deleting the evidence of her complaints.

94. In addition, Defendant Newman's constant, daily harassment of her beginning towards the end of 2016 and continuing up until her termination in June 2017, also exacerbated the Plaintiff's situation. As alleged herein, Newman would continuously micromanage and single out the Plaintiff for mistreatment for little to no reason. For example, she gave the Plaintiff a hard time about the Plaintiff's use of the wrong timekeeping procedure for clocking in and out of work, even though the Plaintiff had been given express permission by her superiors to use Microsoft Outlook to record her time. And when she complained to the other administrators about Defendant Newman's harassment, her complaints fell on deaf ears.

95. This, of course, was all happening at a time when the hospital's staff and resident physicians were beginning to ignore her and acting very cold toward her. This unfriendly behavior was due to the fact that the administrators had convinced them that she was a problem employee that they should not fraternize with.

96. After enduring this harassment as well as the gross invasions of her devices' privacy, the Plaintiff sank into a deep depression and began hurting herself (i.e., a classic symptom of emotional distress). As already alleged herein, there was visible, tangible evidence of the Plaintiff's fragile emotional state and it was noticed by her coworkers and superiors—the Plaintiff began picking at her face and skin. These marks were so visible that her coworkers noticed and commented. At one point, administrator Sherman Addison asked her if she was diabetic, at which point she stared at him for a few seconds in disbelief for having the nerve to ask her about her health condition and for requesting that she attend a meeting. She then told him that she was not in fact diabetic.

97. The emotional nature of these visible wounds was borne out during repeated visits to her psychiatrist, who saw the Plaintiff for "emotional picking" which began before her termination and continued upon her unlawful termination by the entity Defendants. In a

series of meetings, the Plaintiff's psychiatrist discussed with her the impact of the incidents leading up to her termination and the eventual termination itself on her physical and mental well-being, and prescribed medication for her anxiety, *inter alia.*

98. The Plaintiff's claim for IIED must be viewed from the vantage point of the fact that she was particularly susceptible to infliction of emotional distress because she was being constantly harassed in her workplace. She was also extremely frustrated and severely disturbed by illegal changes to her pay, her medical coverage, her retirement, and her employer's hardship denial, and it soon became obvious to her that she was being set up for firing. At the same time, the entity Defendants' administrators and staff were conspiring to and actually hacking into her personal devices, respectively—a violation of numerous criminal statutes (e.g., D.C. Code § 23-542 and M.D. Code § 7-302).

WHEREFORE, the Plaintiff requests that this Court enter a judgment in the sum of $500,000, against Defendants Michael and Newman, and, under the doctrine of *respondeat superior,* against the entity Defendants, jointly and severally, based on the illegal hacking by Defendant Michael and other agents of the entity Defendants and the severe distress caused by Defendant Newman and FPP's staff who were all acting within the scope of their employment. The judgment is a result of damages the Plaintiff has sustained based on that conduct and severe emotional distress she has suffered as a result.

## **PRAYER FOR RELIEF**

WHEREFORE, in addition to the damages requested herein in the Plaintiff's various WHEREFORE clauses, the Plaintiff also requests the following for relief:

1) Punitive damages based on the outrageous conduct of the Defendants that constitutes her intrusion and trespass claims, her IIED claim, and as allowed for under the Federal Wiretap Act (18 U.S.C. § 2520(b)(2));

2) Reasonable attorney's fees and costs;

3) Pre- and post-judgment interest and taxes;

4) Sanitation of the Plaintiff's personnel and small business file;

5) A letter of reference for the Plaintiff to help her find a new job;

6) A Peace Order for Protection from stalking/cyber stalking;

7) Such other relief as the Court or jury deems proper.

## JURY DEMAND

Plaintiff hereby requests that a jury hears and determines all facts raised herein.


Respectfully,


_____/S/_____

Martin F. McMahon, Esq.
Martin F. McMahon & Associates
DC Bar No. 196642
1717 K Street, NW
Suite 900
Washington, D.C. 20006
(202) 862-4343
mm@martinmcmahonlaw.com

Exhibit A

**Henson, Belinda**

| | |
|---|---|
| **From:** | Henson, Belinda |
| **Sent:** | Wednesday, August 05, 2015 2:15 PM |
| **To:** | Worrell, Marie - FPP; m_newman@howard.edu |
| **Subject:** | Request Administrative Support for Structure in the Workplace |

Good Afternoon Ms. Worrell/Ms. Newman:

I sincerely feel a need to contact Ms. Gibbs-DeShields but I'm confident we can address these issues. Dr. Alim shares this same concern in regards to why there's hardly ever any afternoon patients scheduled. Today I learned that one of the residents don't see Intakes after 2pm. When I asked why, it was said that she doesn't want too. This has to stop. I'm also aware of their early departure and this is why they manipulate the schedule. This was the behavior of the previous residents and I spoke to Michelle about this exact same issue before their rotation began and it's starting again.

I personally shared with the residents during the New Resident Orientation that schedule manipulation was prohibited but it's happening. They're the providers not the schedulers and I would like for them to discontinue reviewing the schedule at the front desk. I suggested making them daily copies of the schedule but they continue to go through the appointment book. *Who is accountable here?*

The covering person was eating at the front desk this morning. I whispered to her not to eat at the front desk and she replied out loud while customers were in the lobby "I can't wait to leave here" then she threw her ice cream cup in the trash with such negative force. That was very embarrassing and unprofessional. This operation literally disturbs me because everyone here seems to be afraid to say what is really going except me. We need to have a meeting with Ms. Gibbs-DeShields, Dr. Malik, Dr. Bland, Dr. Alim, other attending physicians, residents and staff in an effort to grow this organization and to stop this unprofessionalism.

We need to developing some billing practices for capturing every single charge. There are concerns whether or not where capturing charges for injectables. We need to review and question the appointment schedule daily. The residents need to be held accountable for seeing and not seeing FPP's patients. The phone, desk and door are still being left unattended. Periodically, an FPP co-workers is here during what I believe is her lunch hour; however, our PSR usually isn't on break. Please encourage FPP staff not assigned to work here to take their lunch break elsewhere as our PSR is still working. In order to terminate these behaviors, we need to begin exercising corrective action. Every organization is doing it; except us. Why aren't we? I am reaching out for administrative support to implement structure in the workplace. I can't imagine that Ms. Gibbs-DeShields have any knowledge of what's happening over here. Please share this with her if you like and let's get this practice off of auto pilot.

Thank you,



Belinda Henson, PSR
FPP Howard University
Mental Health Center
Phone: (202)806-7984
Fax: (202)806-9311

1

**Henson, Belinda**

| | |
|---|---|
| From: | Henson, Belinda |
| Sent: | Wednesday, September 02, 2015 11:27 AM |
| To: | 'Worrell, Marie A.'; 'talim@howard.edu'; Addison, Sherman L; Newman, Marie |
| Subject: | Request Corrective Action Meeting |

Good Morning Leadership Staff:

Since our last group meeting, very little has changed. I am cautious to say the issue with the phones being answered is getting better. Ms. Cooper is aware she's being monitored and this has help; she's even arriving to work on time. However, the regard for authority is still an issue. I'm requesting a meeting immediately with management (all of you) and staff to respond to the recent and following behavior: disregarding Dr. Alim's authority, (still) eating at the front desk, negative comments in the presence of patients and leaving the premises during non break / non lunch time while on company's paid time.

I'm taking my lead responsibility very serious as I should. I can only lead this department with management's support. In order to effectively terminate this behavior, we as a group need to act quickly and make them accountable. I'm requesting corrective action even if it comes in the form of a sincere verbal warning. Can we please meet tomorrow between 9:00 – 9:30am? Please let me know.

Thank you,



Belinda Henson, PSR
FPP Howard University
Mental Health Center
Phone: (202)806-7984
Fax: (202)806-9311

1



HOWARD
UNIVERSITY

**TO:**   Ms. Marie Worrell, Dr. Walter Bland, Mr. Sherman Addison, Dr. Tanya
Alim, Mrs. Marie Newman

**FROM:**   Belinda Henson, Senior PSR

**DATE:**   Friday February 12, 2016

**SUBJECT:   Corrective Action (Insubordination) Involving Employee Michelle
Cooper, PSR I**

The expectation at the Mental Health Center is that each Howard University Faculty
Practice employee adheres to federal and organization policies. On Thursday February
11, 2016 at approximately 9am, employee Michelle Cooper violated a HIPAA federal
regulation.

In recent weeks, Ms. Cooper has failed to capture incoming calls for negligent reasons
i.e. socializing throughout the center. I intercepted a potentially missed call then having
to locate her to return to her workstation to schedule an internal (5S) appointment. Her
body language and verbal demeanor was inappropriate, negative and unprofessional.

Behind my closed door, I heard Ms. Cooper scheduling a patient's appointment utilizing
the reception's desk speaker phone. Ms. Cooper violated HIPAA when she reiterated
patient identifiable information aloud (PHI) i.e. name, DOB. In an effort to correct the
behavior in the moment; I went to the reception desk and asked Ms. Cooper to
discontinue using the speaker feature and utilize the receiver.

She ignored my three requests then rudely says "there's nobody here" and continued
scheduling the appointment. I attempted to educate her that she's discussing patient
information aloud and she continued to say (escalating her voice) "there's nobody here".
I said "you're being very disrespectful" and she replied the same back to me. Three
more rounds of this back-and-forthness until I returned to my office and contacted Mrs.
Newman.

Ms. Cooper breached HIPAA's confidentiality by compromising and potentially
compromising PHI; by me hearing the conversation and the risk of the conversation
being overheard by someone else. Neither internal nor external guests nor employees
should have exposure to any customer's private audio or visual identifiable information;
unless they need to know.

Confidentiality is everyone's legal right including the clientele we serve. Dr. Alim joined
my one-on-one with Ms. Cooper on Tuesday February 9 2016. I reviewed and
discussed with her HIPAA and patients' confidentiality at the front desk as a result of

1 | Page

previous observations. I also provided her with helpful suggestions when discussing patient information in the lobby.

In conclusion, Ms. Cooper lacks the maturity and ability to work independently and productively offsite. She does not possess the professionalism ideal for the Mental Health Center's frontline. She's shown to be uncooperative and continuously fails to demonstrate her willingness to comply and adapt to best practices. Her repetitive disregard for administrative authority and counseling is insubordinate and not conducive to the vision of the Mental Health Center.

Concurrently, Ms. Cooper has failed to practice the scheduling procedures I've suggested in an effort to defuse the recurring scheduling errors at the front desk. Such errors are causing scheduling conflict and customer dissatisfaction. Ms. Cooper has proven that she cannot multi-task nor manage the front desk in a professional manner. She's extremely talkative and is too friendly with the customers i.e. socializing loud in the lobby in lieu of working. This behavior causes an influence affect on other FPP/Non-FPP employees to lounge in the waiting area for long periods of time; talking and laughing loud on company's time. The vision is to tone down the environment and operate a professional practice.

SCHEDULING ERRORS:

- She doesn't cancel appointments in the system or in the book (wasting open slots)
- She'll schedule the patient in the book but fails to immediately schedule the appointment in the system resulting in registration upon arrival. This causes the patient to not receive an appointment reminder from Televox
- Patients arriving with no appointment scheduled or in the future
- Two patients scheduled in the same time slot
- Patients given the wrong date (appointment slip presented by patient)
- Uncoordinated scheduling i.e. schedules a patient at 10:00am in the system and 10:30am in the book. Another patient is scheduled in the 10am book slot which causes conflict when attempting to schedule the appointment in the system.
- Patients are often put on the wrong residents' schedule causing patient accommodation issues
- Patients' appointments being cancelled without notification and they show up
- No scheduled appointment in the system but scheduled in the book and vice versa
- Having to make customer service calls regarding errors resulting in rescheduling

As previously proposed, I recommend reassignment solely based on her resistance to receive constructive criticism, coaching and abiding by department policies, procedures and instructions. She continuously defies the efforts made by the department body to establish structure in the workplace  Her recent behavior laid the foundation for another offender to behave as she did. Sincerely said, her behavior is habitual and tenure related and these negative attributes are unsatisfactory and are perpetually impacting her job performance.

Below is a synopsis taken from the U.S. Department of Health & Human Services HIPAA Compliance and Regulations official website [http://www.hhs.gov/].

**VIOLATION IN WHICH MS. COOPER COMMITTED:**
HHS.gov

## What Information is Protected

**Protected Health Information:** The Privacy Rule protects all *"individually identifiable health information"* held or transmitted by a covered entity or its business associate, in any form or media, whether electronic, paper, or oral. The Privacy Rule calls this information "protected health information (PHI)"[12]

"Individually identifiable health information" is information, including demographic data, that relates to

- the individual's past, present or future physical or mental health or condition,
- the provision of health care to the individual, or
- the past, present, or future payment for the provision of health care to the individual,

and that identifies the individual or for which there is a reasonable basis to believe it can be used to identify the individual.[13] Individually identifiable health information includes many common identifiers (e.g., name, address, birth date, Social Security Number).

Sincerely,

*Belinda Henson*

Belinda Henson
Senior PSR

**Henson, Belinda**

| | |
|---|---|
| **From:** | Henson, Belinda |
| **Sent:** | Friday, February 12, 2016 2:01 PM |
| **To:** | Bland, Walter - Univ.; Addison, Sherman L; Alim, Tanya; Worrell, Marie - FPP; Newman, Marie |
| **Subject:** | RE: HUFP MHC Recommendation |

Good Afternoon Dr. Bland:

I appreciate your involvement and I've also spoken with Ms. Worrell and Mr. Addison.  This incident was composed in writing and I'll give you a copy on Monday.

Thank you.



HOWARD
UNIVERSITY

Belinda Henson, PSR II
HUFP Mental Health Center
Phone: (202)806-7984
Fax: (202)806-9311

**From:** Bland, Walter P [mailto:wbland@Howard.edu]
**Sent:** Friday, February 12, 2016 1:41 PM
**To:** Henson, Belinda; Addison, Sherman L; Alim, Tanya; Worrell, Marie - FPP; Newman, Marie
**Subject:** RE: HUFP MHC Recommendation

This message was sent securely using ZixCorp.

Good Afternoon Ms. Henson,

Thank you for informing us of this matter.  I have spoken with Dr. Alim regarding your recommendation that the employee be separated from the MHC.  Dr. Alim will convene a meeting with you and Ms. Newman to hear your concerns and afterwards will decide what actions will  to be taken to address your concern.

Sincerely,

Walter P. Bland, M.D.
Interim Chair and
Associate Clinical Professor
Department of Psychiatry and Behavioral Sciences

**From:** Henson, Belinda [mailto:bhenson@huhosp.org]
**Sent:** Thursday, February 11, 2016 9:27 AM
**To:** Bland, Walter P; Addison, Sherman L; Alim, Tanya; Worrell, Marie A.; Newman, Marie
**Subject:** HUFP MHC Recommendation

Good Morning Leadership:

Over the past year, I've openly and honestly expressed legitimate concerns regarding behaviors here at the Mental Health Center. The behavior is unprofessionalism, insubordination and conflict. At my sincerest, I'm requesting a meeting to discuss reassignment of an employee. Although this employee has invested years with HUFP; her mentality, negativity and lack of cooperation is not acceptable at the Mental Health Center. A separation from the MHC is being sought and the support of the MHC's administrators is paramount and anticipated. I'll reach out to each one of you regarding your availability.

Sincerely Thanks,

**HOWARD**
UNIVERSITY

Belinda Henson, PSR II
HUFP Mental Health Center
Phone: (202)806-7984
Fax: (202)806-9311

RECEIVED CONFIDENTIAL COMMUNICATION NOTICE. The information in this communication is confidential and may contain information that is privileged or exempt from disclosure under applicable law. If you are not the intended recipient, you are notified that any use, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately and delete this email from your system.

---

This message was secured by ZixCorp®. No SPF - Sender domain does not have a valid SPF, Possible SPAM

---

This message was secured by ZixCorp®.

2

**Henson, Belinda**

| | |
|---|---|
| **From:** | Henson, Belinda |
| **Sent:** | Thursday, February 18, 2016 10:15 AM |
| **To:** | 'Newman, Marie'; Bland, Walter - Univ.; Addison, Sherman L; Alim, Tanya; Worrell, Marie - FPP |
| **Subject:** | RE: Follow Up - RE: HUFP MHC Recommendation |

Good Morning Mrs. Newman:

Although we spoke, this reply is a documented acknowledgement.

Thank you,



HOWARD
UNIVERSITY

Belinda Henson, PSR II
HUFP Mental Health Center
Phone: (202)806-7984
Fax: (202)806-9311

**From:** Newman, Marie [mailto:m_newman@Howard.edu]
**Sent:** Thursday, February 18, 2016 10:07 AM
**To:** Henson, Belinda; Bland, Walter - Univ.; Addison, Sherman L; Alim, Tanya; Worrell, Marie - FPP
**Subject:** Re: Follow Up - RE: HUFP MHC Recommendation

This message was sent securely using ZixCorp.

Good Morning Ms. Henson

I would like to meet with you this afternoon at 2:00 pm at MHC regarding your recommendation.

Thank you

**From:** Henson, Belinda <bhenson@huhosp.org>
**Sent:** Wednesday, February 17, 2016 10:20 AM
**To:** Bland, Walter P; Addison, Sherman L; Alim, Tanya; Worrell, Marie A.; Newman, Marie
**Subject:** Follow Up - RE: HUFP MHC Recommendation

Good Morning Leadership:

I'm following up on my request to meet regarding my recent recommendation for an employee's reassignment.  I've attached an official letter of discipline and recommendation based on my interaction and observations.  I recommend this letter be placed in the employee's file for future reference.  I'm seeking the professional courtesy of a meeting to address overlooked behavior in the Mental Health Center.

Sincerely,

1



HOWARD
UNIVERSITY

Belinda Henson, PSR II
HUFP Mental Health Center
Phone: (202)806-7984
Fax: (202)806-9311

---

**From:** Henson, Belinda
**Sent:** Thursday, February 11, 2016 9:27 AM
**To:** Bland, Walter - Univ.; Addison, Sherman L; Alim, Tanya; Worrell, Marie - FPP; 'Newman, Marie'
**Subject:** HUFP MHC Recommendation

Good Morning Leadership:

Over the past year, I've openly and honestly expressed legitimate concerns regarding behaviors here at the Mental Health Center. The behavior is unprofessionalism, insubordination and conflict. *At my sincerest*, I'm requesting a meeting to discuss reassignment of an employee. Although this employee has invested years with HUFP; her mentality, negativity and lack of cooperation is not acceptable at the Mental Health Center. A separation from the MHC is being sought and the support of the MHC's administrators is paramount and anticipated. I'll reach out to each one of you regarding your availability.

Sincerely Thanks,



HOWARD
UNIVERSITY

Belinda Henson, PSR II
HUFP Mental Health Center
Phone: (202)806-7984
Fax: (202)806-9311

---

This message was secured by ZixCorp(R). No SPF - Sender domain does not have a valid SPF, Possible SPAM

---

This message was secured by ZixCorp(R).

↩ Reply all | ∨     🗑 Delete   Junk | ∨   •••                                    ✕

## Call Center Support of the Mental Health Center

Henson, Belinda
Tue 2/14/2017 2:01 PM
To:   Newman, Marie K

Sent Items

Good Afternoon Mrs. Newman:

A patient informed me that a call center representative has given him my direct office extension [X67984]. I've observed transition concerns but not to this magnitude. Our call volume is gradually increasing due to perpetual blind transfers (non-urgent) transferring various callers to my voicemail to leave messages and most recently, providing a caller(s) with my direct contact number. Disclosing internal staff phone numbers is inappropriate, and will have callers bypassing the call center almost instantly. If it's true that an agent provided my number to a caller(s), the agents should know it's the department's discretion to provide direct contact information. Perhaps it's unspoken but it should be an agent's automatic understanding.

During the implementation and transition of the call center, I've communicated concerns with you and have requested to use Allscripts' "Task" to electronically relay non-urgent concerns, in lieu of transferring callers to the Mental Health Center's front desk and/or backline(s). I requested that only calls requiring immediate and urgent attention be transferred to the MHC. It would expeditious if the agents would announce the caller and purpose before releasing the call. An alternative suggestion, if the call center agents don't have access to Allscripts' "Task", perhaps a MHC Call Inquiry spread sheet can be created and faxed to the MHC 3 times a day for callbacks i.e. 11:00AM, 2:00PM and 5:00PM. Otherwise the intended vision and mission of implementing the call center has failed, and we're back to where we've began. The call center isn't efficient in servicing its purpose if the phone volume isn't controlled. These practices defeat the entire objective.

Ms. Newman, I'm reporting that my line [backline] is being over utilized. I'm neither, the frontline representative nor am I the point of contact for the entire MHC. Although, we've discussed my line being a back-up, it has become the MHC's voicemail message box and the use of my line is heavily being misused. It's understood that this is a transition effect that require addressing and I ask that you please speak with Ms. Freeman regarding.

A service request to restore voicemail at the reception desk has already been approved and submitted. Is it possible to schedule a collaborative meeting or telephone conference with Ms. Freeman to establish a protocol for the MHC's calls or refine an existing protocol to suit the MHC?

In conclusion, please ask Ms. Freeman if she could pull and review the inbound call that was

likely transferred to my voicemail [X67984], yesterday February 13, 2017 at approximately 1:00PM – 1:06PM. The patient, Mr. C.P. left me a voicemail message at 1:06PM, duration of message 40 seconds. Also, please ask Ms. Freeman to prohibit call center agents from disclosing MHC's direct and internal phone numbers to callers. External calls should always be expedited appropriately and providing direct access is the professional courtesy of ours to give [MHC staff].

I'm personally interested in the growth of the MHC. Already, there's been a significant decrease in our scheduling errors. Now that our calls are being received and management by the call center, the PSR has the adequate time necessary to provide quality customer service without the high and uncontrollable call volume.

The observed benefits I'm seeing is the PSR can provide our customers with her undivided attention, she's in a better position to address and collect time of service payments, verify insurance eligibility, obtain additional and essential information and update patients' demographics... As a result of the call center, our service performance is improving. We no longer appear dysfunctional and in operation chaos. The atmosphere is calm and arrivals, service and discharges are properly being rendered.

Can you please follow up on the MHC's credit card terminal installation date?

Sincerely Thanks,

Belinda Henson
Mental Health Center

Exhibit B

From: Henson, Belinda Sent: Monday, August 1, 2016 2:31 PM To: Worrell, Marie A. Cc: Alim, Latya N.; Bland, Walter P.; Newman, Marie Subject: Re: Internet Compliant Good Afternoon HUFP Administrators, Respectfully and heroicaly; HU Research, HUFP and HUH ancillary staff, I'm the only one who isn't taking unethical advantage of the organization. I can provide enormous and legitimate reasons why each and every one of them should be terminated but I won't. I've taken a few here Meers; as a matter of days; why? Because I bring awareness to their behavior in the workplace? Or is it because I'm not a follower? I'll take the high road and disregard their attempts to de-rate you...ruin my reputation and defame my character. They've composed their complaints with such malice and one to

Exhibit C



Microsoft

ACCOUNT   Your info   Privacy   Security   Rewards   Payment & Billing   Devices   Family

Store ∨   Products ∨   Support

Belinda

Search Microsoft.com

**Belinda Henson**

Activity   Manage permissions

🖥 Device health

Let adults in your family check the health and safety of your devices. They can make sure they're up-to-date and see device security and health status. Get more info on devices

Let adults in your family see your devices

⬤ On

People who can see my devices

⬤ bhenson@fishop.org

## Help with Microsoft family features

Set screen time limits

Require kids to ask a parent before buying stuff

Fix screen time limits not working

Fix family activity reporting

Why does Microsoft change me when I create an account for my child?

More help with your Microsoft account

Type here to search



**Devices**

Overview    Manage devices filters

Devices you have signed into with a Microsoft account

Notifications for all devices (1)

⚠ You've allowed admins to help check the health and security of your devices.

View and manage permissions

DESKTOP-3LBNG5
260-4114

Status    Device help & support    Find My device    More actions

Windows 10 Home 10.0.17134.1035

◯ BitLocker Off

⚐ Find My Device Off
   Learn more

How to protect your device with BitLocker

We didn't find any other devices. Add more devices

View and manage permissions

**Help with Microsoft account**



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Telephone: (202) 879-1133 • Website: www.dccourts.gov

BELINDA HENSON
   Vs.
HOWARD UNIVERSITY, INC. et al

C.A. No.    2019 CA 002707 B

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

(3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Robert E. Morin

Case Assigned to: Judge YVONNE WILLIAMS
Date:  April 26, 2019
Initial Conference: 9:30 am, Friday, August 16, 2019
Location: Courtroom 518
      500 Indiana Avenue N.W.
      WASHINGTON, DC 20001

CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief   Judge   Robert   E.   Morin

CAIO-60